James Robertson and Helen Robertson v. Commissioner.
Robertson v. Commissioner
Docket No. 5979-64.
United States Tax Court
T.C. Memo 1966-217; 1966 Tax Ct. Memo LEXIS 65; 25 T.C.M. (CCH) 1124; T.C.M. (RIA) 66217; September 30, 1966
William C. Hague, for the petitioners. Charles H. Powers and Charles S. Stroad, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: This case involves deficiencies in petitioners' Federal income tax for the calendar years 1959, 1960, and 1961 arising out of their alleged failure to report certain income and the assertion by respondent that petitioners' underpayments were due *66 to fraud, thereby making them liable for additions to tax under section 6653(b), [1] as follows: Deficiencies
Year
Income tax
Addition to tax
1959
$595.73
$327.72 *
1960
664.89
332.45
1961
906.80
453.40
Some of the facts are stipulated and are found accordingly. Petitioners reside at 14803 Glenwood, Detroit, Michigan. They filed Federal income tax returns for the years in question with the district director of internal revenue, Detroit, Michigan. Helen Robertson is a party to this proceeding only by reason of having filed a joint return with her husband. Any reference herein to "petitioner" shall be deemed to refer to James Robertson. Petitioners' returns as filed showed refund claims of $199.12, $103.98, and $113.16, respectively. The only source of income shown on these returns was from the City of Detroit. The gross income as reported by petitioners and the unreported income as claimed by respondent is as follows: Gross income
Unreported
reported by
income claimed
Year
petitioners
by respondent
1959
$6,122.96
$2,889.00
1960
6,156.54
3,375.00
1961
6,106.88
4,493.00
*67 Petitioner for 15 years, including the taxable years in question, was an employee of the Department of Public Works of the City of Detroit as the foreman of its Northwest Incinerator. Marvin Sheats was also an employee of the City of Detroit and, in said taxable years, operated the scale at the Northwest Incinerator under the supervision of the petitioner. During that time there were approximately 27 employees working under petitioner's supervision. The Northwest Incinerator was used by rubbish haulers to dispose of rubbish. Some of the business concerns which used the Northwest Incinerator during the taxable years were Winkler Sanitation Co., Detroit Rubbish Co., A. N. Reitzloff Co., Anco Industries, Inc., Variety Trucking Co., Fairall Trucking Co., Kramer Waste Material Co., M. and L. General Trucking Co., Vanguard Trucking Co., Michigan Business Hauling, and Davis Rubbish Removal Service. These firms paid the charges imposed by the City of Detroit for using the facilities at the incinerator. Petitioner, in conjunction with Sheats, entered into arrangements whereby business concerns using the incinerator made extra payments in return for special access privileges and short-weighing *68 of loads. The additional income which respondent has determined that petitioner received derives from these payments. The payments were systematic and continuous during the taxable years involved herein. Petitioner was discharged from his employment by the City of Detroit in July 1962 because of his participation in, and his receipt of payments under such arrangements. The arrangements involved payments of $1, $2, or $3 per load. Petitioner received as his share of the payments under the arrangements $50 to $100 weekly throughout the taxable years. A printed Treasury Department Form 872 designated "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax" was timely executed and filed and extended to September 30, 1964 the period for assessment of tax for the year ended December 31, 1960. Respondent's 90-day notice of deficiency was mailed to petitioners on September 23, 1964. Petitioner received additional unreported income for each of the taxable years 1959, 1960, and 1961 in amounts equal to or greater than the amounts determined by respondent. Petitioner's understatement of income in each of the taxable years was due to fraud. Opinion Petitioner *69 was the sole witness on his behalf. His testimony was vague, general, and, to a large degree, contradictory. It consisted for the most part simply of negative answers to general questions by his counsel as to whether he had received the particular sums alleged by respondent to have been received by him from named business concerns dumping rubbish at the incinerator. Despite these general denials, on direct examination petitioner did admit that he had received "a dollar or two dollars once in a while" and "maybe a dollar, yes, maybe two, maybe three" and other items such as whisky, cigars, and beer. Petitioner finally summarized the situation by stating that he had received some $500 in 1959 and $700 in each of the years 1960 and 1961 for the purpose of facilitating the unloading operations of rubbish haulers. Moreover, on cross-examination he conceded that he had received some 100 checks made out to "Cash" by the Winkler Sanitation Co. in the following total amounts: $1,020 in 1959, $969 in 1960, and $894 in 1961. Against petitioner's testimony, respondent produced several witnesses who testified as to payments which had been made for special privileges at the incinerator. Sheats *70 testified as to the arrangements which he and petitioner made with various rubbish hauling firms, the amounts received thereunder, and the manner in which these amounts were divided between petitioner and himself - usually a 50-50 split. The owner of Winkler Sanitation Co. testified that he paid $50 weekly. A truck driver for A. N. Reitzloff Co. testified as to the arrangements he made and that payments of between $20 and $30 per week had been paid to Robertson and Sheats; one-half of this amount is far in excess of the amounts determined in the deficiency notice to have been received by petitioner from Reitzloff. The owner of Detroit Rubbish Co. gave similar testimony. [2] Sheats' testimony substantially corroborated the testimony of the other witnesses. In view of the foregoing, we find that the testimony of the petitioner is utterly lacking in credibility. In weighing the evidence, we have adhered to the ruling at the trial excluding certain portions of the testimony of the owner of Detroit Rubbish Co. - testimony *71 which, upon post-trial reflection, we would, if necessary, hold to be admissible. Similarly, we have taken into account the fact that the owner of Winkler Sanitation Co. testified that all payments were made by check and that the checks submitted constitute all the checks in question. We interpret his testimony to mean that the checks submitted merely constituted all those which could be identified as having passed through petitioner's hands and that additional payments in which petitioner also shared were made to other persons. In any event, even if we were to give petitioner the benefit of every doubt and thereby limit his share of the amounts of the Winkler payments to 60 percent of the amounts of the checks (Sheats testified that he received $20 out of each $50 weekly payment), it would not help petitioner. The testimony reveals that other rubbish hauling firms made payments in which petitioner shared in amounts far greater than the difference between his share of the Winkler checks and the amounts set forth in the deficiency notice as having been received by petitioner from Winkler. These limitations on the use of the particular testimony of the owners of Detroit Rubbish Co. and *72 Winkler Sanitation Co. are more than counterbalanced by the independent testimony of petitioner's coparticipant, Sheats, [3] with the result that petitioner would fail even if we were to place upon respondent the burden of proof as to variations between the amounts set forth in the deficiency notice as having been received from specified sources and the amounts received from those sources. The evidence clearly reveals systematic and continuous payments by rubbish hauling firms for special privileges at the incinerator and the receipt by petitioners of a substantial portion of such payments. The record as a whole herein affirmatively establishes that petitioner in fact received additional, unreported income in amounts at least as large as those determined by respondent. *73 With respect to petitioner's liability for additions to tax due to fraud under section 6653(b), respondent of course has the burden of proof (Section 7454(a)) and he must establish fraud by clear and convincing evidence. ; . None of respondent's witnesses testified directly to the fraud issue. Indeed, it would have been difficult, if not impossible, for them to do so, for this involves the petitioner's intention, something these witnesses would hardly be in a position to know. It is axiomatic that direct proof of fraud is seldom possible and that generally a finding of fraud must be based on the taxpayer's conduct in relation to the underlying transactions. See . As we have already pointed out, petitioner received sizeable amounts for enabling rubbish hauling firms to obtain special privileges, which were paid systematically and continuously throughout the period in question. The amounts were substantial in relation to petitioner's other income; the unreported income, which we have found was in fact received by petitioner, was *74 47 percent, 55 percent, and 74 percent of petitioner's reported gross income in 1959, 1960, and 1961, respectively. In each of these three years petitioner filed income tax returns showing an overpayment and requesting a refund. These circumstances are strongly indicative of fraud. (C.A. 8, 1961), affirming a Memorandum Opinion of this Court; ; . The only possible mitigation lies in petitioner's own testimony that he believed the payments to be gifts. But we have already found petitioner's testimony not worthy of belief. The payments in question were clearly income and it seems highly unlikely that petitioner did not so realize, particularly in view of the size and regularity of the payments. Nor can petitioner derive any nourishment from the fact that respondent may have failed to prove, by clear and convincing evidence, that every cent of the payments was tainted by fraud. Section 6653(b), by its very terms, and the decided cases establish that, if respondent proves that a part of the deficiency was due to fraud, the addition to tax attaches *75 to the entire deficiency. ; see , affirmed per curiam (C.A. 5, 1958). On the basis of an examination of the entire record, we are convinced that respondent has discharged his burden of proof on the fraud issue. [4] Cf. . Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954. a1 An additional assessment of $59.70 was paid after the due date of the 1959 return.↩
2. A limited portion of this witness' testimony, i.e., relating to actual amounts paid, was excluded at the trial. As to the correctness of this ruling, see infra.↩
3. We have also eliminated from our consideration any evidence that petitioner may have been convicted of bribery. The evidence is meager as to the criminal charges against the petitioner, the conviction had been appealed at the time of the trial herein, and the probative value of such conviction on petitioner's liability for the deficiency asserted or the additions to tax on account of fraud would at best be marginal.↩
4. In view of our finding of fraud, it is unnecessary for us to decide whether the taxable year 1959 is covered by the six-year period of limitations (Sec. 6501(c)(1)), but we note that the unreported amount for that year is in excess of 25 percent of the amount of income disclosed in the return. Section 6501(e).↩